Final case on our call this morning is 106511. Sue Carter, Special Administrator v. SSC Odin Operating Co., LLC. Good morning. May it please the court, my name is Malcolm Harkins and I'm here as counsel for Odin Health Care Center, the defendant below the appellant here. This case comes before the court based upon a petition to appeal that was refiled because there was a split on the critical issue that was decided by the court below here between the 5th District and the 2nd District. Those courts disagreed with respect to the question whether two provisions of the Nursing Home Care Act were preempted by the Federal Arbitration Act. The first provision is section 3-606 and that provision voids waivers of rights to commence an action under the Nursing Home Care Act. The second provision is 3-607 which voids pre-dispute waivers of jury trials. Because that was the issue that was the basis for the petition for leave to appeal, I'd like to focus at least initially on that question. And then to the extent that it's necessary to discuss the other questions that were raised in the reply briefs. The only issue, the issue, preemption issue that you've just framed, is that the only issue that was decided by the appellate court? That issue, yes. And the public policy that was involved was also applied to the wrongful death claim below. But the appellate court decided only the preemption issue. The case turns on that. And there were a number of other issues raised in the appellate court. There were other issues that were raised at the appellate court and there were a couple of other issues that were decided at the trial court. Yes, Your Honor. I would suspect if we affirm the appellate court then there's nothing left to do. But if we agree with you in reverse, would it be your position that those other issues should be remanded to the appellate court? They could be remanded to the appellate court. Yes, Your Honor. Because this court is really faced, obviously, with no record in the appellate court, or at least decision by the appellate court on those. The trial court did touch upon some of those other issues. Is that right? That is correct. The trial court touched upon, and it literally was touched upon, the question of mutuality, the question whether interstate commerce was involved, and it also addressed the public policy question. But there was no hearing held before the trial court, however, on those issues. It was decided solely based on argument. And those issues, other than the public policy question, play no role in the appellate court's decision. Thank you. I just wanted to make sure I understood the procedural path. The portion of the Federal Arbitration Act that's implicated here is Section 2 of the Act, and specifically the last clause of that act. That clause provides that an agreement to arbitrate an issue is valid, irrevocable, and unenforceable. The key language is, save upon such grounds as exist at law or in equity for the revocation of any contract. Because the case turns on that phrase, I think it's important at the outset to emphasize two things about the Supreme Court's jurisprudence on this issue with respect to what are such grounds as exist at law or equity for the revocation of any contract. The first point is that it is emphatic in the Supreme Court's decisions that any contract means any contract. In fact, most of the Supreme Court's more recent decisions italicized the word in Section 2, the word any, to make the point that the defense must be generally applicable to all contracts, not just the contracts that arise under a particular statutory scheme. The second point, and it's closely related and indeed it overlaps to some extent, is that when the Supreme Court has interpreted that any contract clause in the FAA, it's made two points explicit. As I said, any contract means any contract, not a contract that arises under a particular state law. The second point is that the defense doesn't just have to apply to any contract. It must apply generally to any clause in any contract. It cannot apply only to forum selection clauses or else it is preempted by the FAA. The key case, as far as we're concerned here, is Southland Corporation v. Keating, and we've discussed that in the briefs. In fact, Southland makes those points expressly, and it does so in language that could have been addressed to the situation in this case. What was involved in Southland was the California Franchise Investment Law. The Franchise Investment Law gave franchisees certain rights under state law. It also contained a generic provision that prohibited the waiver of any provision of the franchise law. That provision was completely generic. It did not mention arbitration whatsoever. The California Supreme Court interpreted the provision as prohibiting the waiver of the right to go to court to enforce the Franchise Act and invalidating an arbitration agreement. The U.S. Supreme Court held that that interpretation directly conflicted with Section 2 of the Act. Now, the key thing... Is that case Perry? I'm sorry? Is that the case Perry? No, this is Southland v. Keating. Southland, in many respects, is one of the Supreme Court's seminal decisions on this issue. The Perry case came later. The Southland case was never considered by the appellate court. In my opinion, in large measure, that's where the appellate court went wrong. Because if you look at Southland, and obviously look at the majority opinion, but look at the dispute between the dissenters and the majority. If you look at the dissenting opinion, the dissenting opinion makes the point that the franchise investment law embodies state policy and that it gives franchisees special rights and that that decision, that choice, ought to be respected and it can be implemented consistent with the FAA. However, if you go back to the majority opinion and you look at footnote number 11, the majority rejects that analysis. The dissent, in other words, makes an argument that closely tracks the appellate court's public policy argument here. But what the majority says is that, yes, we recognize that contract offenses that are generally applicable can void arbitration agreements. But then it goes on and it says, however, the anti-waiver provision in the franchise investment law, quote, is not a ground that exists at law or in equity for the revocation of any italicized contract, but merely a ground that exists for revocation of arbitration provisions in contracts that are subject to the franchise investment law. You could take the words franchise investment law out and substitute nursing home care act, and that ruling would be four square with the situation that we have here and require reversal of the appellate court's decision. Now, the appellate court's decision is erroneous in three major respects. And those respects overlap. The first is that the appellate court fails to recognize that the anti-waiver provisions apply only to contracts under the Nursing Home Care Act. Just as in Southland, the anti-waiver provision applied only to the franchise investment law contracts. The second point where the appellate court erred is that it concluded that preemption under the FAA required a state law that specifically targeted arbitration. And the third place is that the public policy that the appellate court based its conclusion on is not a public policy that is generally applicable. I want to address each of those briefly. First, that the anti-waiver provisions apply only to contracts under the Nursing Home Care Act. That should be indisputable. If you read Section 3-606, it says that it prohibits waivers of the right to commence an action under Sections 3-601 through 3-607. That is the Nursing Home Care Act. Similarly, the prohibition on predispute waivers of jury trials in 3-607 says in any action under the Nursing Home Care Act, such waivers are prohibited. By statute, that language expressly limits the anti-waiver provisions only to contracts arising under the Nursing Home Care Act. And Southland makes clear that a prohibition that applies only to contracts under one state statute is not a ground under state law that applies to any contract and, therefore, it's preempted by the FAA. Now, as I say, Southland is not mentioned in the Appellate Court's decision. And I think that's one place where they went wrong. The second place where they went wrong is that the Appellate Court presumes that the FAA preempts only state laws that mention or, quote, specifically target arbitration agreements. Again, Southland precludes that argument. As I indicated, the anti-waiver provision in Southland was a generic, generally applicable anti-waiver provision that prohibited the waiver of any provision of the California Franchise Investment Law. Yet the Court found that it was preempted. There's been a more recent case, Preston v. Ferrer, that was also discussed in our briefs that was decided after our argument and briefing in the Court below, in which the Court also finds that an anti-waiver provision that does not mention arbitration is preempted by the FAA. The problem with the Court's specifically target analysis is that this Court and the U.S. Supreme Court have longstanding judicial hostility toward arbitration agreements, and secondly, to put arbitration agreements on equal footing with any other contract. And a rule that says that the FAA preempts only when it specifically target arbitration agreements is not consistent with that policy. Nor is the appellate court's statement that there's no preemption here because the effect on arbitration agreements was indirect and intangible, and it wasn't the primary purpose of the statute. Whether the state law mentions arbitration or not, prohibiting the waiver of a right to commence an action, as does 3-606, or waiver of jury trial, pre-dispute waiver of jury trial, is giving a preference to a judicial forum that is not accorded to arbitration. In other words, they are not on the same footing. Granted, it is preference for a judicial forum that includes a jury, but nonetheless, it is preference for a judicial forum. In addition to standing as an obstacle to full achievement of the FAA's purposes, there's nothing in the FAA or the Supremacy Clause that says that an incidental and tangential effect or the secondary purpose of a statute is exempt from preemption. And to the contrary, the court's decisions, the Supreme Court's decisions, and the decisions of this Court make clear that what the FAA does is that in order to prohibit judicial or legislative attempts, and the word they use is to undercut enforceability of arbitration contracts, the FAA withdraws power from the states to require claims to be committed to a judicial forum. And, Justice, that is from Perry, by the way. That quote comes from, I'm sorry, it's not a quote. It's a paraphrase. It comes from Perry. And, you know, the mistake, the practical mistake that the appellate court made here is evident from this. If rather than stating a preference, a pro-judicial forum, a pro-jury trial preference, the Nursing Home Care Act had stated an anti-arbitration, explicit anti-arbitration provision, even the appellate court would agree that the FAA was violated and that that provision would be preempted. And you can look at the opinion. It's in the appendix at 160. Yet when you step back and say, well, what's really happening here? By prohibiting the waiver of a jury trial, the anti-waiver provisions ipso facto and necessarily prohibit agreements to arbitrate. In fact, this court in its Molina decision in 2006 held virtually the same thing. The court came at it from the other perspective, but it held virtually the same thing. It said that thus the loss of the right to jury trial is a necessary and fairly obvious consequence of an agreement to arbitrate. There are two sides of the same coin. The appellate court simply ignores that fact, and it ignores this court's functional analysis in Molina. Much is made in the appellate court's opinion and in our opponent's briefs of the fact that the anti-waiver provisions would also void an agreement to submit to a bench trial or to some other alternative dispute resolution as if that makes the anti-waiver provisions generally applicable or applicable to any contract. In fact, it remains applicable only to Nursing Home Care Act contracts. But secondly, that's irrelevant. The Federal Arbitration Act doesn't say anything about bench trials, and it doesn't say anything about other alternative dispute resolutions, but it does state a strong federal public policy preference for arbitration, as does Illinois law. And it's not the state law's impact on bench trials that's governed by the FAA. It's the impact on arbitration. The third point, and I recognize that these points are interrelated, is that the appellate court grossly and erroneously overstated its conclusion that public policy is a generally applicable contract defense that voids an arbitration contract permissibly under the FAA. The problem with the court's rationale is this. The court asserts the general proposition that violation of public policy is a legitimate state law contract defense that's generally applicable and asserts that as dispositive. But the appellate court never looks at the specific public policy that's involved. To give an example, unconscionability or the gambling agreements. If there's an arbitration clause in a gambling agreement, that would be unenforceable because the contract as a whole, the prohibition on gambling applies to any contract, and it applies to every provision in the contract. Unconscionability is also public policy derived. If it applies, unconscionability applies to every contract, and it applies to every clause in every contract. That's the problem that we have here. The appellate court just simply did not look at the specific public policy. Again, this court's decision in Molina commands that when you identify the public policy, you have to measure the impact of the public policy, the specific public policy, against the Federal Arbitration Act and determine whether it impedes the goals of that act. Now, plainly, when you look at 3-606 and 607, they're impediments to achievement of the FAA Act's goals. They absolutely prohibit pre-dispute agreements to arbitrate claims. Southland makes the point perfectly clear that such provisions are preempted. In fact, as I said, Southland preempted or rejected, I should say, a similar public policy argument that franchisees could get special protections that were not available in all other contracts. Is it your position that it is not possible for states' public policy to be used to nullify an arbitration agreement? Absolutely not. I want to be very clear about that. In fact, in the court below, we recognize that public policy in general is a defense to contract enforcement. But that's not the issue here. The issue is the specific public policy. And that's the point I was trying to make when I said unconscionability initially arose as a public policy matter that courts applied to void contracts. Well, unconscionability is a legitimate defense because it applies generically to all contracts and all clauses. The problem here is that the public policy that the court applied was grounded in the Nursing Home Care Act specifically, and the court never considered or failed to appreciate that it applied only to one type of contract and only to form selection clauses. It's that impact on both of those components that are problematic here. It's not public policy. It's the specific public policy. And my time has expired, so thank you, Your Honors. May it please the Court, Brian Barrett, Assistant Attorney General on behalf of the State of Illinois. Excuse me. I'm going to be splitting my time with Ms. Yandel on behalf of the plaintiff. This Court has often cautioned against the unnecessary adjudication of constitutional issues. If there's a state law ground or an alternative ground for reaching the issue, that's what the case should turn on. So before addressing the constitutional issues, I want to address whether the anti-jury waiver provisions are either inapplicable here because there's two contract formation questions, whether the arbitration fails for lack of mutuality or whether it was unconscionable. And I think it's appropriate for this Court to consider these because of the procedural posture of this case. The mutuality agreement was passed upon by the circuit court. The appellate court declined to answer it. The state was not even brought into this case until the second petition relief to appeal was filed, when we received the Rule 19 notion. So we haven't had a chance to address these issues. We are the intervener. We have the rights of the appellate, and I think we can bring these issues up, and this Court can consider them. Or alternatively, I think it would certainly be appropriate for this Court to remand for the appellate court or circuit court to reconsider the issues of mutuality or unconscionability. That's what you asked for, isn't it, in your brief? Well, we didn't actually ask for a remand on the mutuality issue or the unconscionability issue, but in light of the arguments that I've seen in the reply brief, that there are issues to what whether Ms. Gott had the ability to rescind this agreement, whether she could have consulted a lawyer. I think that raises certainly issues of her state of mind when she signed this agreement. So I think it would certainly be appropriate. And I think as counsel, I believe, agreed on his opening argument that a remand would certainly be within this Court's power at this point. And you also raised the Social Security Act, right, for the first time in this Court? That's correct, Your Honor. And that likewise was not addressed by the appellate court? Correct. And that would be subject to remand as well if we agree with opposing counsel's argument? Correct. Is it your position that the better place for those issues to be determined, especially as intervener coming in at a later stage of the proceedings, would be the trial court or the appellate court? Well, I think the mutuality agreement could be the mutuality discussion to be addressed by this court or the appellate court. But if there are any fact questions, I think it could be. And certainly the appellate court could always remand it there for limited purposes to the trial court if a factual determination would be necessary. That's correct, Your Honor. That's correct, Your Honor. Was the signing of the agreement a condition of admission? No, it was not. It said so in the agreement itself. Yet the arbitration agreement was still illusory because it was intended to abide both parties. It was purportedly an agreement for mutual arbitration. Yet there was a clause, a provision in the agreement, which exempted from arbitration claims of less than $200,000. Realistically, this meant that only a resident who would suffer severe personal injury or death would ever be in a position where they would have to arbitrate, whereas it's highly speculative that a nursing home like Golden would ever have a claim of more than $200,000 against a resident like Joyce Scott. The most likely claim that they would have would be for a nonpayment. But under Illinois law, a nursing home is permitted to discharge a resident after 75 days. So it was certainly within their control to either discharge Miss Scott well before any nonpayment reached $200,000 or bring a suit against her while she was in the nursing home in the circuit courts. Any high-valuatory claim against a resident like that is unlikely. In fact, if you look at the reply brief, in response to our arguments, the only citation by Odin Healthcare is to a newspaper article, which says nothing about a lawsuit. I think if there were lawsuits in which nursing homes had sued residents, I think those would be reported decisions. I've looked through the case law. I've seen none. I've seen hundreds of cases where residents of nursing homes, it's just not something that happens on a regular basis or it certainly was not the intent of this agreement to protect a resident against a high-value lawsuit by a nursing home. Odin lists a number of other matters that they claim were consideration for this agreement. For example, that they agreed to pay the fees of arbitration up to $5,000. But again, that doesn't really alter the case that this was an agreement for mutual arbitration, not unilateral arbitration, and that once the contract for mutual arbitration fails, the proper remedies to avoid the contract. Even if the contract was, there was a mutual agreement, the effect of this liability floor also read with the contract unconscionable. It was a completely one-sided agreement. It unfairly surprised, it would have unfairly surprised God. A reasonable consumer looking at this would not have understood that a likely claim brought by them against a nursing home was going to go to arbitration, whereas a claim by a nursing home against them would likely still end up in court. The fact, and again, and here's where some of the fact questions arose in the reply brief. Odin contends the agreement was not procedurally unconscionable because she knew she was signing an arbitration agreement and had opportunity to rescind. In fact, Ms. Scott was admitted to the nursing home on January 12th. She signed the agreement six days later and died on January 31st, so she never really may not have had the opportunity to rescind the agreement within 30 days as the agreement provided. We don't know what her state of mind was. We don't know how ill she was. We don't know what the circumstances under which she signed this arbitration agreement. But in any event, I think as a matter of law, you can look at this clause and see that it was so well hidden and so, I would say, not comprehensible to an average reasonable person that it's unconscionable on its face. As to the public policy defense that is the thrust of this appeal, we have to remember that the FAA requires courts to treat written agreements equal to any contract. The Federal Arbitration Act was not intended to turn arbitration agreements or arbitration clauses into super contracts. The Nursing Home Care Act itself does not disfavor arbitration. It doesn't single out arbitration provisions for suspect status. It doesn't apply only to arbitration provisions. It doesn't take its meaning from the fact that a contract to arbitrate is an issue, and it does not regulate arbitration contracts in a manner different from other contracts. The sections 3606 and 3607 work in tandem to safeguard the constitutional jury right, whether that means avoiding an agreement to arbitrate future disputes or a prospective agreement to proceed by bench trial or mediation. It does not treat the arbitrator worse than the judge or any other alternative dispute resolution procedure. Bowdoin's argument that a neutral law tangentially impacting an arbitration law goes too far. The reliance on Southland and Farrer is inapplicable because both cases actually involve statutes that targeted arbitration or were construed as targeting arbitration. But in protecting nursing home residents, what the state has done is essentially declared a class of contracts as unconscionable contracts to waive the jury trial. It doesn't make sense that courts could decide on a case-by-case basis that these contracts are unconscionable, but that the state legislature couldn't do the same thing on a class-wide basis. Again, the Nursing Home Care Act was not designed to hinder or regulate arbitration, and it does not run afoul of the FAA. I just want to touch very briefly on the Social Security argument I raised. Social Security includes a broad savings clause in it. It says that the available remedies for Medicaid or Medicare enforcement are, in addition to those otherwise available under state and federal law, shall not be construed as limiting any remedy available to any individual under common law. It's undisputed that the right to a jury trial is a common law remedy, not simply a procedural right. In the Social Security Act, Congress is clearly intended to preserve and protect the jury trial right from federal or state encroachment, regardless of other causes of action. Imposing arbitration under the Federal Arbitration Act is clearly inconsistent with the preservation of these statutory rights. This is not conceptually different from the cases I've stated, which mostly involve the Jones Act or the Death on the High Seas Act. In those cases, Congress was seen to have been preserving the right to a jury trial that would otherwise be an admiralty, and it's, I think, a similar concept that Congress was relying on at the time. And finally, just to touch on this letter from the CMS letter that Odin says this Court should defer to, the letter itself suggests that arbitration agreements are governed by state law, which suggests that in that federal agency's eyes, there was no federal preemption. And it also expresses concerns that arbitration agreements have been used to violate federal regulations. So I'm not sure what sort of deference we can give to this letter, what we can really conclude from it, but it certainly doesn't support the Odin Health Care's position that this arbitration, the arbitration provisions are preempted by the FAA. That being said, I will reserve the balance of my time for the plaintiff, and I will, if the Court has no other questions, I would ask that the appellate court's decision be affirmed or, on the alternative, that the case be remanded. Good morning, Your Honors. It pleases the Court, Counsel. My name is Stacey Andel, and I represent the plaintiff, Sue Carter. I want to touch on a couple of issues before I get into the meat of my argument, which is the wrongful death claim issue. But before I do that, I want to point out one thing that counsel for the appellate said in his argument to this Court, which I think is key. And it's his position, and I think it's not a position that's supported by the United States Supreme Court president, that their precedent is clear, that the exception set forth in Section 2, which subjects any arbitration agreement to generally applicable state contract defenses, is there. And the Court has reiterated on several occasions that the intent of that language and that their rulings do not make arbitration agreements super agreements. The point was to put them on equal footing. What counsel has argued, and the position has been consistently, that, in fact, that's not the case. The appellate would seek to put an arbitration agreement under these circumstances on a footing above other contracts. He specifically, I believe, argued this morning, in fact, that the issue before this Court, or the issue is the specific public policy. The issue that the appellate court should have addressed but failed to address was the specific public policy and not public policy as a generally applicable state contract defense. Well, that simply belies even the rationale and the holdings of the United States Supreme Court, and it's far-reaching. The Supreme Court specifically said that agreements to arbitrate are subject to any generally applicable state contract defense. In this state, we have a number of state contract defenses, certainly unconscionability, also fraud, mutuality, and specifically illegality based on public policy. The Supreme Court precedent doesn't separate those out. It doesn't limit the generally applicable state contract defenses to unconscionability or fraud, but it says any that would apply. Now, in this case, the appellate focuses on the fact that those sections of the Illinois Nursing Home Care Act reflect or embody the public policy of this state. But the contract defense at issue here is generally applicable. In other words, public policy generally applies to nullify and invalidate any contract in this state which is seen to violate public policy. The fact that, depending on what circumstances and the relationship of the parties, that the source of public policy may either be found under common law or in many situations under different statutes. So I think the point is that, in fact, public policy is one of the generally applicable contract defenses that applies to this contract. In addition on the preemption question, on the question of whether or not the FAA or the Federal Arbitration Act applies, the other matter that was specifically raised and specifically dealt with and ruled upon in the circuit court was the fact that, before you even get to the question of preemption, you first have to figure out whether or not the FAA even applies in this case. And it's our position and has been our position from day one that the requirement of sufficient connections or contacts with interstate commerce to invoke the provisions of the FAA do not exist in this case. And the circuit court specifically ruled that, in the aggregate, the factors upon which the defendant and now the appellant relied to say that there was a significant enough nexus with interstate commerce to invoke the provisions of the FAA do not exist. And I would point the court's attention to that section of our brief. And specifically, this case is much like the case out of, I believe it was South Carolina, the Thames case. And some of the same factors were put forth by the defendant in that case in terms of their argument, supporting their argument, that there was a connection to interstate commerce. Did either the trial court or the appellate court address the interstate commerce issue? The trial court certainly addressed the interstate commerce issue and specifically ruled, and I'm paraphrasing, that when he looked at the factors in the aggregate, the factors in the aggregate were not significant enough or adequate to invoke or were not adequate connection to interstate commerce to invoke the FAA. The trial court specifically held that. And that wasn't addressed at all in the appellate court because they ruled on it. The appellate court did not address that. And specifically, the question in that regard is not whether or not the general activities of the defendant or the nursing home in this case affect interstate commerce because pretty much anything you do can affect interstate commerce. But the key question has to be the relationship between those factors and the contract between the parties. In other words, as in Thames, the South Carolina Supreme Court held that while the factors alleged by the appellants in this case could evidence their involvement in interstate commerce, the relationship of those factors to the agreement between the facility and the resident was insufficient to form the basis of the contract between the parties. Because like in this case, we're talking about an agreement between a resident of a nursing home in this state, in Illinois, and a nursing home in this state. The nursing home is a licensee in this state, although they are part of a national conglomerate as the appellant state. The specific entity that owns the license and with whom this got contracted is a local corporation. The ‑‑ If we were to employ the analysis employed by the appellate court, would that lead to widespread eviscerations of arbitration agreements? No, I do not believe so, Your Honor. The arbitration agreements would not be eviscerated by the holding of the appellate court because they're still, the holding is consistent with the precedent of the United States Supreme Court because all they did was apply a generally applicable state contract defense. And that's what they did. In other words, if you were to look at it on the other side, Your Honor, the converse would be true. Then it would be a case that in this state public policy would be, would apply as a defense to enforcement of any contract in this state unless it's an arbitration agreement. And that's simply not the case. So, no, I do not believe so, Your Honor. I want to touch real quickly on the wrongful death issue. Even if this court should decide that the arbitration agreement applies and Ms. Gott was bound by the arbitration agreement with respect to her survival action, there can be no question that there was no basis to buying Sue Carter as the next of kin or other beneficiaries on the wrongful death claim. Ms. Carter did not sign the operative agreement. There is some argument that there were two agreements, but as we pointed out, the first agreement was certainly merged into the second agreement on her second admission. I believe that's my time. Yes. Thank you, Your Honor. Thank you, Counselor. Thank you. I'd like to address one point about the preemption argument that's been raised and then move on to the other issues. One of the things that's been suggested about preemption is that it is something that has to be decided based on this specifically targeting language. In other words, in the brief, the State in particular argues that the preemption analysis is not one that looks at the law as applied. And that is just simply wrong. There's U.S. Supreme Court precedent that's cited in our reply brief, the Rath Packaging case, that specifically says that the court is to look at the law as written and as applied. Secondly, with respect to the claim that the Social Security Act clearly intended to protect the right to a jury trial, frankly, there's no basis for that whatsoever. In evaluating that, you start from the proposition, which this Court recognized again in the Molina decision, that the analysis starts by making clear that the exceptions to the FAA's rule requiring enforcement of arbitration agreements are not to be recognized lightly. There must be clear indicia of congressional intent. What they're arguing is for an implied repeal of the FAA's provisions insofar as it applies to nursing homes. The provision in the Medicare Act says that the enforcement remedies, the enforcement remedies being the ones that enforce the regulations against nursing homes, do not preempt the residents' rights to bring lawsuits. In other words, it was a clause that was designed to save the common law and statutory remedies from preemption by an argument that the regulatory scheme had occupied the field and there was no room for private actions. It mentions nothing about the FAA, and there is no hardly clear indicia, but there's no indication that it intended to preempt the FAA. What about, Mr. Harkins, the unconscionability argument raised by the State with respect to nursing home plaintiff, you get a jury trial, nursing home defendant arbitration? I'm sorry, Your Honor, I couldn't hear you. I believe the State made some reference to the fact that under the clause being unconscionable in the contract if the nursing home was the plaintiff would be entitled to a jury trial where the patient would not. Your Honor, actually that was the next point that I was going to come to. First of all, unconscionability was not raised below, neither was fraud or duress, and our position would be that it was waived and it's not appropriate to address it here. However, that argument that the State made depends on the presumption that the arbitration agreement has to stand alone. In fact, the arbitration agreement cross-references the admission agreement and says that it is the foundation of the relationship between the parties and the basis for all the rights and the obligations. I think the argument can be made that the two, while they are in separate documents, are in fact at least independent. With respect to the claim that the nursing home doesn't have to arbitrate anything, the point that was to be made by including the article from the Chicago newspaper about the nursing home fire is that there are certainly claims that we can posit that would exceed $200,000. A nursing home could seek liability directly against the resident or could do it on a contribution basis. By careless smoking, fires occur in nursing homes. If the resident was liable for that, the nursing home may have a claim against it. In our brief below, my colleagues pointed out there could be a defamation claim against the nursing home. There could be claims because a resident negligently injured other residents. A resident on resident abuse in nursing homes is unfortunately something that happens. If the nursing home was held liable for that, they may have a claim over against the resident. This isn't a situation as in the automobile cases where the dealer excludes all the possible claims. This is more like the Cook case where the court made the point that there doesn't have to be equality in the consideration as long as there are classes of cases that would be submitted to arbitration that's sufficient. But beyond that, both the plaintiff and the state make their argument as if the reciprocal promises to arbitrate were the only consideration that was given. In fact, the agreement says that there's a couple of other aspects of consideration. One of those things is, and I want to correct. I'm sure it was an inadvertent mistake that my colleague for the state made. What the agreement says is that the facility will pay all of the costs of the arbitration. It doesn't limit it to $5,000. The $5,000 is a second provision that says that the facility will pay up to $5,000 of the resident's attorney's fees if they go to arbitration, win or lose. Now, it's been argued that that's a cap on the attorney's fees that the facility could ultimately be liable for. That's not true. That's win or lose. Below, we made the point and stipulated that it wasn't intended to impose a cap on the attorney's fees and that Illinois law, to the extent that it provides that a resident who wins the arbitration is entitled to all of their fees, they would get all of their fees. In addition, the resident selects the place of arbitration and the resident and the facility mutually select the arbitrators. There are three arbitrators. Each is common. Each picks one and then those two pick the other. This isn't a situation where the contract is illusory at all. As far as unconscionability, look at the terms of the contract. It says on its face in capital letters, in fact it says three times once in capital letters that you're waiving the right to jury trial. It says that it could be rescinded within 30 days of its execution. It provides a number of other protections in there that are for the benefit of the resident and, frankly, this is not Kinkle. I think it's kind of ironic that we're getting beaten up because the arbitration agreement is in a separate document. It's in a separate document so that there could be no mistaking what it was. This isn't a Kinkle case where it's buried on the back of a form in small print. The agreement says that you can consult an attorney. You can seek other advice. In fact, those weren't empty words because the second agreement here was signed six days after the admission. I want to touch very briefly on the interstate commerce arguments that my opponents have made. The problem with that argument is illustrated both by the briefs and what counsel for the plaintiff just said. Both counsel for the plaintiff and the state would focus on the specific transaction here, the specific contract, but if you look at the Citizens Bank case from Alabama, the Supreme Court says that's not the appropriate focus. It's not whether the specific transaction has connection to interstate commerce, but it's whether the economic activity in question in the aggregate, economic activity is defined by Gonzalez v. Raich as the production, dissemination, and consumption of goods. The economic activity here is the delivery of nursing home services, number one. That in the aggregate has an enormous effect on interstate commerce. What our opponents are essentially asking is that this court hold that the delivery of long-term care services is not related to interstate commerce. Now, in the Citizens Bank case, one of the points that the court makes is that in Katzenbach v. McClung, Ollie's Barbecue purchased $70,000 of goods in interstate commerce. The approach that our opponents are suggesting would, instead of looking at the aggregate effect, as was done in Katzenbach and also in Wickard v. Filburn, they want to look at what one diner in the barbecue restaurant ate and whether that has a sufficient connection to interstate commerce that it justifies regulation under the FAA. But that's not the law. In fact, here, just looking at Medicare payments alone, there were over $2 million paid by an out-of-state insurance company to this nursing home for care, for the economic activity. In addition, one of the other points that the Citizens Bank case makes is that the bank there, engaging in commercial lending, was involved in business throughout the region. The affidavit, which was not contested below, in this case says that the beds in the facility were bought from Wisconsin, the food comes from Missouri, the oxygen comes from Missouri, and various other things were purchased out-of-state as well. And I see my time is up, and I couldn't help but think that if my children were here, they would probably take that home if it causes me to shut up. So thank you, Your Honors. Thank you, Counsel. Case number 106511.